IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| KERRON ANDREWS | * |
| v. | * Civil No. CCB-16-2010 |
| BALTIMORE CITY POLICE DEPARTMENT, ET AL. | * |

## MEMORANDUM

Plaintiff Kerron Andrews brings this action against defendants the Baltimore City Police Department ("BPD") and former Police Commissioner Kevin Davis,[1] as well as Detectives Michael Spinnato and John Haley,[2] alleging violation of his right to be free from unreasonable searches and seizures and seeking a permanent injunction, damages, costs, expenses, and attorneys' fees. Andrews sues each of the defendants under 42 U.S.C. § 1983, alleging a violation of the Fourth Amendment. He also sues Spinnato and Haley under the Maryland Declaration of Rights, alleging a violation of Article 26 of that charter. Now pending is defendant BPD and defendant Davis's joint motion to dismiss or, in the alternative, for summary judgment and defendant Haley and defendant Spinnato's joint motion for partial judgment on the pleadings. The parties have fully briefed the issues, and oral argument was heard on January 18, 2018. Supplemental correspondence was filed June 27 and 28, 2018. For the reasons set forth below, both motions will be granted.

## BACKGROUND

---

[1] Commissioner Davis is sued in his official capacity only.
[2] Detectives Spinnato and Haley are sued in both their individual and official capacities.

1

Plaintiff Kerron Andrews ("Andrews") is a resident of Baltimore, Maryland. (ECF No. 2, ¶ 13). The Baltimore City Police Department is a local government agency. *Id.* at ¶ 17. Commissioner Kevin Davis ("Commissioner Davis") is the former Commissioner of the BPD. *Id.* at ¶ 19. Detective Michael Spinnato ("Detective Spinnato") is a detective with the BPD assigned to the Warrant Apprehension Task Force ("WATF"). *Id.* at ¶ 14. Detective John Haley ("Detective Haley") is a detective with the BPD assigned to the Advanced Technical Team ("ATT"). *Id.* at ¶ 15.

On April 27, 2014, Andrews was identified by photo array as the individual who shot three people during a drug deal on Stafford Street in Baltimore City. (ECF No. 24-1, p. 4). A warrant for Andrews's arrest was issued on May 2, 2014. *Id.* Although the officers initially were unable to locate Andrews, Detective Spinnato was able to obtain Andrews's cell phone number through a confidential informant. *Id.* On May 5, 2014, Detective Spinnato obtained a pen register/trap and trace order ("PRO") for that cell phone number from Judge Barry G. Williams, a judge of the Circuit Court for Baltimore City. *Id.* The PRO authorized the BPD:

> to use for a period of sixty (60) days from the date of installation, a Pen Register \ Trap & Trace and Cellular Tracking Device to include cell site information, call detail, without geographical limits, which shall be installed and used within the jurisdiction of this Court, upon the telephone(s) having the number(s): 443-208-2776, a AT&T; Sprint/Nextel; Virgin Mobile; T-Mobile; Cellco Partnership, DBA Verizon Wireless, Verizon; Cricket Communications, Inc; and / or any other Telecommunication service provider, telephone.

(ECF No. 18-3, p. 14 of 19).[3]

Later that same day, Detective Spinnato asked Detective Haley and the ATT to assist him in tracking Andrews. (ECF No. 2, ¶ 39). The ATT served Andrews's phone company, Sprint, with the PRO. (ECF No. 24-1, p. 4). Sprint released to them Andrews's phone records, which

---

[3] I find there is no genuine dispute as to the authenticity of the PRO, which the BPD attached to an earlier motion in this case. (*See* ECF No. 18-3).

revealed historical location information for Andrews's cell phone. *Id.* This information allowed defendants to isolate the general location of Andrews's phone. *Id.*

Although the parties dispute how accurately the officers were able to locate Andrews's phone based solely on the records obtained from Sprint, they agree that at some point the officers felt it necessary to utilize a cell-site simulator ("CSS") called "Hailstorm" in order to locate Andrews more precisely. (*See* ECF No. 2, ¶ 42; ECF No. 24-1, pp. 4-5). Defendants describe a CSS as "a duplicate of equipment that records dialing, routing, and signaling information and can be used to send a signal to [a] phone to identify its location, in real-time." (ECF No. 24-1, p. 14). Andrews alleges numerous additional details about CSS that defendants do not dispute. He states that a CSS masquerades as a cell tower that emits particularly strong signals. (ECF No. 2, ¶ 28). A cell phone usually transmits signaling information—including the cell phone's number, location and international subscriber identification number ("IMSI")—to its service provider's nearest cell tower. *Id.* at ¶ 26. When there is an activated CSS nearby, however, the cell phone unknowingly transmits that information to the CSS instead. *Id.* at ¶ 28. This is true whether the cell phone is located behind walls inside a home or in the hand of an individual walking down the street. *Id.* at ¶ 29.

Although the parties disagree about when the officers first activated the CSS, (*see* ECF No. 2, ¶ 44; ECF No. 24-1, p. 5), they agree that at some point it was activated and revealed that Andrews's cell phone was located inside a home at 5032 Clifton Avenue. (*See* ECF No. 2, ¶¶ 45-46; ECF No. 24-1, p. 5). After the cell phone was located, Detective Spinnato knocked on the door and obtained consent to enter the residence. (ECF No. 24-1, p. 5). He did so and arrested Andrews, who was sitting on the couch with the cell phone in his pants pocket. (ECF No. 2, ¶ 47; ECF No. 24-1, p. 5).

3

On August 20, 2015, the Circuit Court for Baltimore City granted a suppression motion filed by Andrews in his state criminal prosecution. *See State v. Andrews*, 227 Md.App. 350 (2016). The Circuit Court found that "the government violated [Andrews'] Fourth Amendment rights by essentially using the Hailstorm to locate him at [his] residence." *Id.* at 368. On March 30, 2016, the Court of Special Appeals of Maryland upheld that ruling, finding that "the evidence obtained in the search of 5032 Clifton Avenue is inadmissible . . . and was properly excluded by the suppression court." *Id.* at 420. The State did not appeal this ruling to the Maryland Court of Appeals.

On June 10, 2016, Andrews filed the complaint in this case, alleging that the defendants violated his Fourth Amendment rights as part of a department-wide practice of using a CSS without first obtaining a warrant. (*See* ECF No. 2). Specifically, Andrews claims that "when purchasing or acquiring use of HAILSTORM from or through the Harris Corporation, [the BPD] and the Office of the State's Attorney for Baltimore City signed a non-disclosure agreement ["NDA"] with the Federal Bureau of Investigation ("FBI"), by which they contracted not to disclose to the public or any court any information about HAILSTORM, even its existence." *Id.* at ¶ 36. Defendants acknowledge that they entered into such an agreement. (*See* ECF No. 30, p. 12). They even provide the court with a copy of the agreement, which states in part:

> The Baltimore City Police Department and Office of the State's Attorney for Baltimore City shall not, in any civil or criminal proceeding, use or provide any information concerning the Harris Corporation wireless collection equipment/technology, its associated software, operating manuals, and any related documentation (including its technical/engineering description(s) and capabilities) beyond the evidentiary results obtained through the use of the equipment/technology including, but not limited to, during pre-trial matters, [and] in search warrants . . . If the Baltimore Police Department or the Office of the State's Attorney for Baltimore City learns that a District Attorney, prosecutor, or a court is considering or intends to provide [such] information . . . in a manner that will cause law enforcement sensitive information relating to the technology to be made known to the public, the Baltimore Police Department and/or Office of

4

> the State's Attorney for Baltimore City will immediately notify the FBI in order to allow sufficient time for the FBI to intervene to protect the equipment/technology and information from disclosure and potential compromise.

(ECF No. 30-1, p. 2). The NDA was signed on August 11, 2011, by both then-BPD Police Commissioner Frederick H. Bealefield, III, and then-State's Attorney for Baltimore City Gregg L. Bernstein. *Id.* at p. 5.

Andrews alleges in Count I that each of the defendants violated his freedom from unreasonable searches and seizures guaranteed by the Fourth Amendment. He alleges in Count II that Detectives Spinnato and Haley violated his freedom from unreasonable searches and seizures guaranteed by Article 26 of the Maryland Declaration of Rights. On June 8, 2017, the BPD and Commissioner Davis filed the pending motion to dismiss or, in the alternative, for summary judgment. (ECF No. 24). On December 29, 2017, Haley and Spinnato filed the pending motion for partial judgment on the pleadings. (ECF No. 44).

## STANDARD

The BPD and Commissioner Davis have filed a dispositive motion styled as a motion to dismiss under Fed.R.Civ.P. 12(b)(6) or, in the alternative, for summary judgment under Fed.R.Civ.P. 56. They have attached exhibits to their submissions. (*See* ECF No. 18-3; ECF No. 30-1). A court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). If the court does so, "the motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). Therefore, a motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F.Supp.2d 431, 436–37 (D. Md. 2011). "When the movant expressly captions its motion 'in the alternative' as one for summary judgment, and submits matters

outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court 'does not have an obligation to notify parties of the obvious.'" *Sager v. Hous. Comm'n of Anne Arundel Cty.*, 855 F. Supp. 2d 524, 542 (D. Md. 2012) (quoting *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir.1998)). A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." *Sager*, 855 F.Supp.2d at 542 (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2011 Supp.)). Because the court is considering the defendants' submissions, their motion will be treated as a motion for summary judgment.

Haley and Spinnato have filed a motion for partial judgment on the pleadings under Fed.R.Civ.P. 12(c). Under Rule 12(c), "after the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." If "matters outside the pleadings are presented to and not excluded by the court," a Rule 12(c) motion, like a Rule 12(b)(6) motion, "must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). Therefore, this motion also will be treated as a motion for summary judgment.

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A material fact is one that may affect the outcome of the suit. *Anderson*, 477 U.S. at 248. In assessing a motion for summary judgment, the court must view the facts, and all inferences justifiably drawn therefrom, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The

court must decide whether there is a genuine issue for trial, "not . . . weigh the evidence and determine the truth of the matter." *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson*, 477 U.S. at 249).

## ANALYSIS

The court focuses its analysis on the BPD and Commissioner Davis's motion, because resolving that motion also resolves Haley and Spinnato's motion. Andrews sues the BPD and Commissioner Davis under 42 U.S.C. § 1983.[4] When a plaintiff sues a municipality under Section 1983, he may seek to hold the municipality responsible for its own unconstitutional acts but may not seek to hold the municipality vicariously responsible for the acts of its employees. *See Monell v. Dep't of Social Services*, 436 U.S. 658, 692 (1978). Therefore, a plaintiff must prove two things to impose *Monell* liability on a municipality. First, she must prove the municipality acted according to an official municipal "policy or custom." *See Connick v. Thompson*, 563 U.S. 51, 61 (2011); *Board of Commissioners of Bryan County v. Brown*, 520 U.S. 397, 404 (1997). Second, she must prove the "policy or custom" caused—or was the "moving force"—behind the violation of her constitutional rights. *Connick*, 563 U.S. at 60–61; *Bryan County*, 520 U.S. at 404–05.

Andrews argues that the NDA was an "official municipal policy" of the BPD which was the "moving force" behind a violation of his Fourth Amendment rights. He claims his Fourth Amendment rights were violated when the BPD used a CSS to search for the location of his cell phone without first obtaining a warrant.

---

[4] Naming Commissioner Davis in his official capacity is redundant. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity.") (internal citations omitted) (emphasis in original). Therefore, I omit continued reference to former Commissioner Davis and refer instead only to "the BPD."

7

Preliminarily, however, Andrews argues that, under the doctrine of issue preclusion, it has already been established that his Fourth Amendment rights were violated. The court will address this argument before proceeding to the *Monell* analysis.

I.  **Issue Preclusion**

The Maryland Court of Special Appeals held in Andrews's criminal case that his Fourth Amendment rights were violated. *See State v. Andrews*, 227 Md.App. 350 (2016). Andrews argues that the resolution of this issue must be afforded preclusive effect. The BPD argues that two of the four requirements for issue preclusion are not present. For the reasons explained below, I agree that at least one of the requirements for issue preclusion is not present. Therefore this court may decide anew whether Andrews's Fourth Amendment rights were violated.

The Full Faith and Credit Act, 28 U.S.C. § 1738, dictates that a federal court must give a state court judgment the same preclusive effect it would be given in the courts of the state that rendered the judgment. Therefore, this court must give a Maryland judgment the same preclusive effect it would be given in Maryland state court. Under Maryland law, a party is precluded from relitigating an issue when four questions are "answered affirmatively":

> (1) Was the issue decided in the prior adjudication identical with the one presented in the action in question?; (2) Was there a final judgment on the merits?; (3) Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?; (4) Was the party against whom the plea is asserted given a fair opportunity to be heard on the issue?

*Garrity v. Maryland State Board of Plumbing*, 447 Md. 359, 369 (2016).

The BPD argues that in this case the third and fourth questions cannot be answered affirmatively. It claims it was neither a party to the state case nor was in privity with a party to that case. It also claims it has not yet had a fair opportunity to be heard on this issue.

A.  **Privity**

Both parties acknowledge the BPD was not a party to Andrews's state criminal case. They dispute whether the BPD was in privity with the State of Maryland, which was a party to that case. I find it was not.

Under Maryland law, "the analysis of privity for purposes of collateral estoppel focuses on whether the interests of the party against whom estoppel is sought were fully represented, with the same incentives, by another party in the prior matter." *Matthews v. Cassidy Turley Maryland, Inc.*, 435 Md. 584, 628 (2013). "Maryland cases analyzing the concept of privity within the rules of collateral estoppel place great emphasis on the procedural rights of the party against whom the doctrine is to be invoked." *Warner v. German*, 100 Md.App. 512, 520 (1994). "In discerning whether a party's procedural rights have been addressed adequately, a court may focus on the nature of the interests binding the two parties, and, correspondingly, whether they share the same incentive in their separate litigation attempts." *Id.* at 521. *See also Subsequent Injury Fund v. Ehrman*, 89 Md.App. 741, 754 (1992). "This priority is reflected in the requirement of collateral estoppel that a second party cannot be covered by a previous decision unless he or she had an appropriate opportunity to appeal the first decision." *Warner*, 100 Md.App. at 521.

Andrews argues the BPD was in privity with the State of Maryland for two reasons. First, he claims the BPD is "an agency of the State." (ECF No. 27, p. 17). Second, he claims the BPD's "legal interests were identical to those of the State's in the criminal case—namely to convince the trial and appellate courts that Mr. Andrews's Fourth Amendment rights were not violated." *Id.* at 18. Both arguments fail.

Andrews's first argument fails because the BPD is not a "state agency" for purposes of this case. As the BPD notes, "if it were, [it] would be immune to Plaintiff's suit." (ECF No. 30,

p. 9). States are immune to suits by individuals under the Eleventh Amendment, and Maryland has not waived that immunity with respect to suits under Section 1983. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Chin v. City of Baltimore*, 241 F.Supp.2d 546, 548 (D. Md. 2003). "The Baltimore Police Department is not entitled to Eleventh Amendment immunity," but is instead "subject to suit under § 1983 as a *local government entity*." *Chin*, 241 F.Supp.2d at 548-49 (emphasis added). Regardless of how the BPD is treated in other contexts, the BPD is not a "state agency" for purposes of this Section 1983 action.

Andrews's second argument, although closer, also fails. The interests of the BPD in this case and the interests of the State of Maryland in Andrews's criminal case are similar. Both parties wish to prove the officers did not violate Andrews's Fourth Amendment rights. Viewed more closely, however, the interests of the BPD and the State are different. Whereas the State's primary incentive was to convict a single individual, the BPD's primary incentive is to defend itself against allegations that it has a department-wide policy of violating individuals' constitutional rights. This difference in incentives has had a practical effect. The State chose not to appeal the intermediate appellate court's ruling that the officers' conduct was unconstitutional. The State presumably had good reason not to pursue such an appeal. However, it is hard to imagine the BPD would not have chosen to appeal this ruling—a ruling that its own conduct was unconstitutional—had it been afforded the opportunity to do so. The Maryland Court of Appeals has expressly stated that privity analysis should focus on a party's procedural rights and particularly on whether a party has had "an appropriate opportunity to appeal the first decision." *See Warner*, 100 Md.App. at 521. That the State did not pursue a final appeal is strong evidence that the BPD's interests were not "fully represented, with the same incentives" in Andrews's

criminal case.[5] For these reasons, Andrews has not shown the BPD was in privity with the State of Maryland.

## B. Fair Opportunity to Be Heard

The absence of privity is reason alone not to apply issue preclusion, but it is worth noting the fourth requirement of issue preclusion is also absent. Because the BPD was neither a party to the state case nor in privity with a party to that case, it has had no opportunity to be heard on the issue currently before the court. Andrews does not argue the BPD has had such an opportunity, but argues "the State"—with whom he argues the BPD was in privity—has had such an opportunity. As discussed above, the BPD was not in privity with the State. This lack of privity likewise proves the BPD has not yet had a fair opportunity to litigate the issues before the court. Accordingly, the doctrine of issue preclusion does not bar this court from deciding whether the BPD's conduct was constitutional.

## II. Fourth Amendment Violation

Having found that issue preclusion does not apply, I find next that Andrews's Fourth Amendment rights were not violated. Assuming the officers conducted a "search" within the meaning of the Fourth Amendment,[6] the PRO constituted a warrant to conduct that search. There is no genuine dispute of material fact regarding this issue. Therefore, for the reasons explained below, I will find as a matter of law that the PRO constituted a warrant to conduct the search and that Andrews's Fourth Amendment rights were not violated.

---

[5] Notably, numerous federal circuit courts have agreed that a Section 1983 plaintiff "may not invoke the doctrine of collateral estoppel against officers following a favorable ruling in a prior criminal proceeding." *See Mccoy v. Hernandez*, 203 F.3d 371, 375 (5th Cir. 2000) (citing cases). Although suits against officers in their individual capacities are different from suits against police departments, the alignment of interests is the same in both contexts. In the context of suits against individual officers, the courts agree that this alignment of interests is not sufficient to establish privity. The same is true here. In both contexts, it would be improper to afford preclusive effect to a state prosecutor's failed attempt to defend the constitutionality of an officer's action.

[6] At the January 18th hearing, (ECF No. 48), the BPD conceded for purposes of this motion that the officers' conduct constituted a Fourth Amendment "search." That concession appears particularly appropriate in light of the Supreme Court's recent ruling in *Carpenter v. United States*, 138 S.Ct. 2206 (2018).

The Fourth Amendment establishes "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. Amend. IV. In order to prove a Fourth Amendment violation, an individual must first demonstrate that the Amendment applies by demonstrating that there has been either a "search" or a "seizure." If the individual can do so, she must then demonstrate that the search or seizure was "unreasonable." In order to show that a "search" or "seizure" was "unreasonable," she must show that no warrant to conduct the search or seizure was issued and that no exception to the warrant requirement applies. *See Carpenter v. United States*, 138 S.Ct. 2206, 2221 (2018); *Riley v. California*, 134 S.Ct. 2473, 2482 (2014); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

The BPD has conceded for purposes of this argument that it conducted a "search", and it does not argue that an exception to the warrant requirement justified that search. Therefore, the only issue before the court is whether the PRO satisfied the warrant requirement.

The Fourth Amendment states that: "no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. From this plain text of the amendment, the Supreme Court has distilled three separate components of the warrant requirement:

> First, warrants must be issued by neutral and detached magistrates. Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense. Finally, warrants must particularly describe the things to be seized, as well as the place to be searched.

*Dalia v. United States*, 441 U.S. 238, 255 (1979) (internal citations omitted). A document that contains each of these three requirements is a "warrant" for Fourth Amendment purposes, even if it is called by another name, such as an "order." *See id.* at 256.

12

Andrews argues the PRO did not satisfy either the probable cause or the particularity component of the warrant requirement. (*See* ECF No. 27, p. 13). For the following reasons, both of these arguments fail.

### A. Probable Cause

First, the PRO clearly contained a finding of "probable cause" as required by the Fourth Amendment. Andrews's argument to the contrary is belied by the plain text of the PRO.

"Those seeking [a] warrant must demonstrate to the magistrate their probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense." *Dalia*, 441 U.S. at 255 (internal citation omitted). "Probable cause exists where the facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed, and that evidence bearing on that offense will be found in the place to be searched." *Safford Unified School Dist. No. 1 v. Redding*, 557 U.S. 364, 370 (2009) (internal citations omitted).

The very first paragraph of the PRO states "the Court finds that probable cause exists and that the applicant has certified that the information likely to be obtained by the use of the above listed device(s) is relevant to an ongoing criminal investigation, To wit: Attempted Murder." (ECF No. 18-3, p. 13 of 19).[7] Moreover, the PRO application stated (1) investigators had obtained an arrest warrant for Andrews for attempted murder; (2) investigators had obtained Andrews's cell phone number; and (3) suspects often contact people on their cell phones to assist them in hiding from the police. *Id.* at p. 3 of 19. This information was enough to "warrant a man

---

[7] Judge Williams signed the application beneath another paragraph finding probable cause. (ECF No. 18-3, p. 12 of 19) ("Upon a finding that probable cause exists based upon the information supplied in this application, that the said individual is using the cellular phone number of 443-208-2776 for criminal activity and that the application will lead to evidence of the crime(s) under investigation.").

13

of reasonable caution in the belief that" Andrews had committed a crime and that the evidence sought (the location of Andrews's phone) would "aid in a particular apprehension . . . for a particular offense." *Dalia*, 441 U.S. at 255 (internal citation omitted).

Andrews argues that when Judge Williams signed the PRO he found "'probable cause' to believe that the information likely to be obtained by the BPD 'is relevant to an ongoing investigation,'" which is "less than the 'probable cause' required for a search warrant to issue under the Fourth Amendment, and instead comports with the showing necessary to approve installation of a pen register or trap and trace device." (ECF No. 27, p. 8).[8] Although the PRO used language that conformed to the pen register statute, that statute does not require *any* finding of "probable cause." *See* Md. Code Ann., Cts. & Jud. Proc. § 10-4B-04(a). Instead, it requires a finding that a search is likely to yield information "relevant to an ongoing criminal investigation." *Id.* In the PRO the judge found "that probable cause exists *and* that the applicant has certified that information likely to be obtained by the use of the above listed device(s) is relevant to an ongoing criminal investigation." (ECF No. 18-3, p. 13 of 19). Thus, the PRO contains *both* a finding of "probable cause" *and* a finding that the search is likely to yield information "relevant to an ongoing criminal investigation." The existence of extraneous language does not negate the finding of probable cause, which is clearly present on the face of the PRO.

### B. Particularity

Second, the PRO satisfies the particularity component of the warrant requirement. Again, Andrews' argument to the contrary is belied by the plain text of the PRO.

---

[8] The installation and use of a pen register is not considered a "search" under the Fourth Amendment. *See Smith v. Maryland*, 442 U.S. 735, 745-46 (1979). Therefore, the government is not required to obtain a warrant to use a pen register. Instead, under a Maryland statute, it must obtain an order supported by a finding that the PRO is likely to yield information relevant to an ongoing criminal investigation. *See* Md. Code Ann., Cts. & Jud. Proc. § 10-4B-04(a).

The particularity requirement demands that a warrant state "the place to be searched and the persons or things to be seized." *United States v. Grubbs*, 547 U.S. 90, 97 (2006). The parties fundamentally disagree about how to identify the "place to be searched" in this case. The BPD argues that "the warrant explicitly described the place to be searched as 'the telephone(s) having the number(s): *443-208-2776.*'" (ECF No. 24-1, p. 11) (emphasis in original). Andrews argues that the PRO did not "describe with particularity *any* location to be searched, let alone homes on the 5000 block of Clifton Avenue including 5032," where Andrews's cell phone was ultimately located. (ECF No. 27, p. 13) (emphasis in original). The parties' disagreement reveals an inherent tension that exists wherever the aim of a Fourth Amendment "search" is to locate an object: the government does not know in advance where that object will be located. The Supreme Court addressed this inherent tension in *United States v. Karo*, 468 U.S. 705 (1984). There the government installed a beeper in a container in order to track the location of the container. *Id.* at 708. There, as here, the government could not predict the ultimate location of the beeper at the time of the warrant request. *Id.* at 718. The Court dealt with this reality not by dispensing with the particularity requirement altogether, but by finding the government could satisfy the particularity requirement by describing "the object into which the beeper is to be placed, the circumstances that led agents to wish to install the beeper, and the length of time for which beeper surveillance is requested." *Id.*

Here the PRO authorized the "use for a period of sixty (60) days from the date of installation, a Pen Register \ Trap & Trace & Cellular Tracking Device to include cell site information, call detail, without geographic limits, which shall be installed and used within the jurisdiction of this Court, upon the telephone(s) having the number(s): 443-208-2776." (ECF No. 18-3, p. 14 of 19). Although this order did not set forth a particular address that was to be

searched, it authorized the BPD to use a cellular tracking device to elicit cell site information from Andrews's cell phone for a period of sixty days. Such an order satisfies the particularity requirement in precisely the manner envisioned by *Karo*. Indeed, in light of *Karo* it is clear that—Andrews's argument to the contrary notwithstanding—the government did not need to predict where the phone would eventually be found in order to satisfy the particularity requirement.

It is worth noting that the particularity requirement does not demand "a specification of the precise manner in which [the warrant is] to be executed." *Dalia*, 441 U.S. at 257. *See also Grubbs*, 547 U.S. at 98. Therefore, the PRO did not necessarily need to specify whether the officers planned to use a pen register or a CSS. In any event, the PRO *did* authorize the BPD "to employ surreptitious or duplication of facilities, technical devices or equipment to accomplish the installation and use of a Pen Register \ Trap & Trace and Cellular Tracking Device" and to "initiate a signal to determine the location of the subject's mobile device on the service provider's network or with such other reference points as may be reasonably available," including a "Real Time Tracking Tool." (ECF No. 18-3, p. 14 of 19). Thus, although the PRO most obviously authorized the use of a pen register, it *also* authorized the use of a surreptitious real-time tracking tool like a CSS.[9]

In short, because the PRO was issued by a "neutral and detached magistrate"; contained a finding that "probable cause exists"; and stated with particularity the object to be searched, it was a Fourth Amendment "warrant."

Finally, I note that although the precise issue before the court has not yet been addressed in this circuit, I draw support for my holding from both Judge Hollander's opinion in *United*

---

[9] Because the PRO objectively authorized the use of a cell-site simulator, the officers' subjective intent at the time of the application is irrelevant. For this reason, and because there is no genuine dispute as to the authenticity of the PRO, *see supra* note 3, there is no need for discovery in this case. (*See* ECF 27-1).

*States v. Wilford*, 961 F.Supp.2d 740 (D. Md. 2013), *aff'd* 689 Fed.Appx. 727 (4th Cir. 2017), and the opinion of the Maryland Court of Appeals in *State v. Copes*, 454 Md. 581 (2017). *But see State v. Copes*, 454 Md. 581 (2017) (Hotten, J., dissenting); *State v. Andrews*, 227 Md.App. 350 (2016).

In *Wilford*, the government "pinged" the defendant's cell phone in order to obtain the real-time location of that cell phone. *See Wilford*, 961 F.Supp.2d. at 747-48. The Fourth Circuit upheld Judge Hollander's finding that a PRO substantially similar to the one at issue here constituted a Fourth Amendment "warrant" to conduct that search. *See Wilford*, 689 Fed.Appx. at 730; 961 F.Supp.2d at 772–73.[10] Judge Hollander's ruling did not depend on a precise understanding of the technology used. Indeed, the court noted that "no testimony was offered . . . as to the precise technology used to obtain cellular phone location information." *Wilford*, 961 F.Supp.2d. at 747. Therefore, Andrews's effort to distinguish that case on the basis of the technology used is unsuccessful. (*See* ECF No. 27, pp. 13-14). Simply put, any difference between "pinging"—as the court imagined it in *Wilford*—and using a CSS is immaterial for purposes of this analysis.

In *Copes*, the Maryland Court of Appeals was faced with a factual scenario essentially identical to the one at issue here. 454 Md. at 594-98. The court overturned the lower court's grant of a motion to suppress, finding that the officers' conduct was subject to the "good faith exception" to the exclusionary rule. *Id.* at 626-29. Because the "good faith exception" applied, the majority did not need to decide "whether the [PRO] did, in the end, provide constitutionally-sufficient authorization for law enforcement use of the [CSS] in this case." *Id.* at 626. Nevertheless, the court "recognize[d] the strength [of] the State's argument on this issue," finding that the PRO was "issued by a 'neutral magistrate' (a circuit court judge), stated that 'the

---

[10] To be clear, neither Judge Hollander nor the Fourth Circuit specifically addressed the issue of a cell-site simulator.

17

Court finds that probable cause exists,' identified a specific cell phone to be tracked, and authorized the actions requested in the application." *Id.* at 625-26. As a result, the court noted the "strong—perhaps even conclusive—argument that the [PRO] provided constitutionally-sufficient authorization for use of the [CSS]." *Id.* at 626.[11]

Buttressed by these decisions, I find as a matter of law that the PRO constituted a warrant authorizing the BPD to conduct a search for the location of Andrews's cell phone using a CSS. Therefore, Andrews's Fourth Amendment rights were not violated.[12] Accordingly, the BPD is entitled to summary judgment on Andrews's claim against it under 42 U.S.C. § 1983.

One further word: the court's determination that Andrews's Fourth Amendment rights were not violated should not be mistaken for its approval of the government's conduct. Here the government (1) contracted not to disclose its use of cell-site simulators "in search warrants" and then (2) took a form document authorizing the use of less-intrusive technology and edited certain phrases so that the document could function as a search warrant authorizing the use of cell-site simulators. While I find that, objectively, constitutional standards were met, a more candid approach to the court would have been preferable. Warrants are required to safeguard individual privacy in the face of new, potentially intrusive, technology. If law enforcement wishes to use new technology to combat crime, it may—indeed, it should—do so. But it should be candid about the types of searches it actually plans to conduct. Fortunately, shortly after the events of this case, the General Assembly enacted a statute that provides a specific probable cause

---

[11] The Court of Appeals also concluded that, despite the deficiencies of grammar, punctuation, and sentence structure, "the application and order clearly inform a reasonably diligent reader of what the officers seek to do and how they plan to do it (even if they do not describe the technical details)." *Id.* at 627–28.

[12] Because Andrews' Fourth Amendment rights were not violated, the court will grant Haley and Spinnato's joint motion for partial judgment on the pleadings. ECF No. 44. Haley and Spinnato moved only with respect to Count One, Andrews's Fourth Amendment claim, but it follows from the court's ruling that they are not liable under Count Two, Andrews's claim under Article 26 of the Maryland Declaration of Rights. *See Wilson v. Prince George's County, Maryland*, 893 F.3d 213, 224 (4th Cir. 2018) ("The same standard applies to the Maryland Declaration of Rights claims as to claims asserted under the Fourth Amendment."). Therefore, the court will enter judgment in favor of Haley and Spinnato on both counts.

procedure for authorizing law enforcement to track suspects' locations through their cell phones. Chapter 191, Laws of Maryland 2014, codified at Maryland Code, Criminal Procedure Article ("CP"), § 1–203.1. As a result, law enforcement is presumably more transparent today when obtaining judicial authorization for the use of cell-site simulators. In the future, when afforded the opportunity to use new, even-more-intrusive technology, law enforcement would do well to inform the court clearly about the methods it plans to use.

## **CONCLUSION**

For the foregoing reasons, defendants' motions will be granted. A separate order follows.

8/1/18
Date

Catherine Blake
United States District Judge